218-0090 Euclid Beverage v. John Rowenton May it please the Court, Counsel? Good afternoon, I am Adam Burnett. I'm appearing on behalf of the appellant in this case, John Rowenton. This case comes before you on two main issues. The first is whether the commission award of an AD2 was against the manifest weight of the evidence. The arbitrator in this case awarded an AD1 wage differential. The arbitrator at trial, and particularly here, hears the evidence firsthand and has the in-person opportunity to evaluate the credibility of testifying individuals. No reviewing tribunal should substitute its judgment on matters such as credibility. Whoa, whoa, whoa, whoa, whoa, whoa. The arbitrator is not the one that determines credibility, the commission is. And the cases are very clear about that. And we have cases that say if the commission disagrees with the arbitrator on credibility, they have to list their reasons why. But it's the commission that determines credibility, not the arbitrator. But go ahead. In certain cases, that was a quote from Euclid's brief to the Supreme Court, right on page 589. Well, I don't care what brief was quoted. It's simply not a correct statement of the law. It is apparently backed up by certain cases that were in exterminating versus the industrial commission. What is your proposition? You said something. That the arbitrator is the best one to weigh the credibility of the witnesses because they're hearing the evidence firsthand. No, the commission always weighs the credibility. So you're saying that the arbitrator is binding on credibility, buying the commission? Not buying, but it's giving weight. You have a case that says that. In working exterminating? Yes. The appellate court overturned the commission decision reinstating the arbitrator whose determination was based on credibility. That doesn't mean that the arbitrator overrules the commission that matters with credibility. No, I'm not arguing that at all, Your Honor. But the commission can be overturned on issues of credibility based on the arbitrator's findings. We don't want to spend all of our time arguing that proposition. Yes, Your Honor. In this case, the commission gave no weight to a report that our appellate court found more persuasive than the opinions of respondents like witnesses. This was the report by Ms. Helmer, which included a vocational rehabilitation assessment and labor market survey. And they had reasons for doing that, right? They do, but I'm going to argue that those reasons are incorrect and are not supported by the facts in the case. Respondent did not object to this report. But more importantly, the commission and the circuit court decisions argue that Ms. Helmer did not have a full job history of the claimant, and this is what's incorrect. Claimant's resume is in the record on page 411. Ms. Helmer's vocational history taken from the claimant is on page 332. Comparing these two, Ms. Helmer clearly describes the job duties both in Mr. Bowhead's resume and in his testimony. His resume details the delivery manager's position, which is what the commission took issue with, believing that she didn't have information about that. The vocational history report on 332 explains that he was responsible for driver work audits to make sure that the product was rotated properly, that drivers were polite and professional, and that he was responsible for hearing any complaints from clients, and that he would submit the documents to his supervisor. That matches up with the delivery manager position that is on Mr. Bowhead's resume on C411. Did he enroll in a vocational rehabilitation program of any kind? No, he requested that, but that was not offered to him. Did he engage in any self-directed job search? He did not. I would intend to get to those issues regarding the maintenance, but the commission seems to have largely based their no-weight decision on Ms. Helmer's report based on these facts that they decided that the report did not include these job details or this job that Mr. Bowhead reported for four months. Wasn't one of the key issues whether or not the claimant had an intention, a bona fide intention to return to work? It seemed that, you know, there was some dispute about that, and he was offered something, and he didn't show up for work. So what do you have to say about that? So he was never offered a chance to return to work. All he was offered was an offer to interview for a position that the arbitrator likened to a sham job offer. Ms. Helmer's report... Again, you keep citing the arbitrator. Can you get into what the commission found, please? Well, the commission ruled the same way on maintenance as the arbitrator. So they upheld the arbitrator's award of maintenance. And that was found to not be within Mr. Bowhead's capabilities pursuant to the vocational report. So there are basically three different jobs at issue in this case. Mr. Bowhead largely worked as a delivery, a sales delivery for a distribution warehouse. And that's the main job that he did. He worked for four months prior to his employment with Euclid in this matter as a delivery manager where he had some limited supervisory roles. The area where the commission seems to have gotten confused is that in its appeal, Euclid argued that the report by Ms. Helmer didn't describe the fact that she didn't contact the employer or Euclid to find out details of this distribution warehouse manager job that was mentioned in their offer to interview letter. So that was the sole thing lacking in her report is that she didn't find out the specific details of this job that was mentioned in the offer to interview letter. So that's where the mix-up, in my opinion, happened for the commission. And instead of documenting anything about that job, they documented the wrong job and said that Ms. Helmer was not informed about the delivery manager job that Mr. Bowhead worked in. So it's the appellant's opinion that because this report should be given weight, the commission ruled against the credibility of the report for the wrong factional reason. And the commission's opinion is not based on the facts in the record. And therefore, the AD-1 award is proven by the vocational report that documents what John Bowhead's new wage would be pursuant to this report, and that satisfies the second prong of Copperweld with the labor market survey. What about the commission's conclusion that Helmer's report was completed in anticipation of litigation disformance prior to the hearing? Does that bear on it at all? Can they make that finding? There's no factual evidence to support that besides the timeline of the case. There's no issues with credibility in the report that the commission documents besides that one statement. And then referring back to my previous argument about the job history that was provided to Ms. Helmer. And so I have little basis to argue on that because there's no reasoning for that opinion in the commission's decision. And so I don't know what else the petitioner could have done in this case. If he had delayed trial three years, then the report would have been in the halfway point instead of closer to the trial than when he stopped working. But there's no timelines like this in the Act that require the petitioner to do these things at certain times. The main timelines in the Act are in what was Rule 7110.10, which requires that the employer create a vocational plan to determine whether or not vocational rehabilitation is necessary and can assist in the injured employee returning to work and increasing his earning capacity. Who's McGrail? That is one of the employer's representatives. He testified he invited the claimant to apply for the warehouse manager, correct? Yes. And what was the claimant's response to that invitation? There was no response to that invitation to apply. So does that help him by not responding? It doesn't help him. In my opinion, it doesn't hurt him because it's not a job offer. There was no offer of a job, and the injured worker knew that he wasn't qualified for this job. It's something he has never done before, and the vocational expert in her report said it's something that he's not at all qualified for and does not have any of these skills that are required by this skilled position. And what were those skills that were required? I'm sorry? What were those skills that were required in this offer? Some of the main skills, well, it's not detailed in the offer what the skills are. So that would mainly be from the testimony of McGrail and, I believe, McEnery from the respondents. And this is Helma, right, that's entering this opinion? Yes. Okay. Was she aware of all the things he did in prior work? It does appear so, despite the commission's finding to the opposite of that, because she does go thoroughly through his work history, and it matches up. And the vocational history provided by her is on page 332. It matches up with the record that was from his resume that was obtained from his personnel file with Euclid, which is on page 411. And so the two histories match up. There's no alternative evidence that he has done any sort of work different from what's on these two pages in the record. Did the claimant ever return to work at all following his termination from Euclid? He did not. He applied for and was approved for social security disability benefits after Euclid terminated his employment. So how do you respond then to Euclid's argument that rehabilitation, and under those circumstances, would not be mandatory nor appropriate because he did not show an intention to return to work? Our response would be that he did show an intention to return to work. He doesn't have to wait indefinitely for Euclid to start paying his benefits before he takes another action. Well, isn't there an obligation triggered by his intention to return to work? Do they have an obligation to provide this if he never intends to go back to work? Well, he did request vocational rehabilitation in November of 2011, and then he did request some physical rehabilitation as well. And then both of those were ignored. Those requests were ignored, and Euclid did not provide any benefits to him. And so after that, he went and did apply and was accepted for social security disability benefits. And so he complied with Section 8A of the Act, whereas the respondent, Euclid Beveridge, did not comply. They did not create a report that would be necessary to assess whether or not vocational rehabilitation would have been appropriate. Instead, they did not do anything. And so the employee has proven that he was unable to be self-sufficient. He couldn't go back to work in his previous employer or within his previous job. The fact that he lost his previous vocation is never in dispute, following the arbitration. So the first problem with Copperweld is not really in dispute here. It's all about the second problem with Copperweld. But referring back to maintenance, once he found out that he was not able to be self-sufficient and the employer was not going to provide him work, he did request vocational rehabilitation. He did request physical rehabilitation. And then those weren't forthcomings that he received social security benefits. And he never engaged in a self-directed job search either, correct? He did not, but he's not required to under the Act. Labor market surveys and certified rehabilitation counselors are good evidence in the commission's opinion, in the court's opinion, for what a earning capacity is. And so instead of proving what he was actually earning and actually able to earn, he approved what he was able to earn through the use of a vocational rehabilitation counselor. So if he's receiving social security disability and you're successful in obtaining wage differential benefit, does the social security disability benefit go away? It wouldn't go away. It would be offset, potentially, depending on what his maximum allowable income is. Social security disability would reduce the amount up to a certain level. So the wage differential benefit is not? How long does that go on? This is prior to the amended Act, so it's until. Forever. Definitely. Forever? Until he passes away. Right. Well, I'm just curious as to whether there ever is any adjustments. I'm sorry? I'm curious as to whether there ever is any adjustments for social security. Because he's made whole, arguably he's made whole under wage differential, isn't he? He would be made whole under wage differential. Right. So he'd no longer arguably be disabled, would he? He still would be. There's a different definition of disability for social security. So he's not permanently and totally disabled for workers' comp purposes, but he does have certain restrictions that prevent him from returning to his previous work and transferring to other work under social security disability. Very good. You'll have time in reply. Thank you. Counsel, you may respond. Thank you, Governor. Thank you, Mr. Corbyn. Robert Smith. I represent Hewlett-Edwards. Hewlett, in fact, is here today as well. Our position today is history forward. The commission did the right thing, made the right decision with respect to the remedy for a permanent disability. The man is the only 8D2 recovered. That was an appropriate decision. The commission decision awarding the maintenance benefit is against the manifest way of the evidence. And that's the part the Circuit Court reversed, correct? Correct. So the Circuit Court stepped in and handled that. I mean, that's essentially our case is what the Circuit Court said. So my walk away today, as Hewlett, is the 40% of the person 8D2 recovered and the denial of the maintenance benefit. And why was maintenance not appropriate in this case? That's the burning question. It is the burning question. I was going to hit the PPD first, but I'll go into maintenance if you'd like. I think that the reasoning used on the PPD takes us to the maintenance. Meaning, I think that a good understanding of how the PPD award came to be gets us to the maintenance, if I may. So let me dispense, if I can, with the PPD. We're not questioning those restrictions. I'm not questioning if he was partially incapacitated from his usual customary life of what I got. You need more than that. You need to prove the impairment are burdens. It's his burden. It's not mine. It's his burden to prove it. And that evidence is not before us. We know that he never looked for work after November of 2011. We know, because he admitted, I never looked for work. We don't often see that kind of clarity. Clarity then comes through even more. I'm offering the interview to commit for the job, and I don't follow up on it. Counselors use the word sham. I understand that. There's a reason I brought in the president and CEO of the company. There's a reason I brought in the VP of Operations. It's a family-owned company. Who knows the business of you better than most of you guys? So I brought them in. Why is John Bohan the guy that you were going to offer the interview to? Well, we've known him a long time. We hired him to begin with. Skill set. This is not a cookie-cutter industry. It's heavily regulated. I need a guy who can get along with people. I need a guy that knows our business. And I'd like to hear from him today. That was that testimony. We need to hear from John Bohan. So we went through about 40 people, mostly inside people. We eventually hired a guy who, like John, didn't have any formal taught training or college education, kind of worked his way up through the company, worked in the warehouse, but knew our business. So we hired him. Testimony and trial was salary up to the low 70s. I'm certainly conscious of Valerie Day and her directive that when we have our type of investigation and we have impairment awareness, that the directive is an AP model. I understand that. But we don't have that proof of impairment in our investigation. I'm not asking you to re-weigh the evidence, but I'm asking you to look at the choices that John and I have made. I'll say that that's the choices, but look at the choices, and those are choices we're trying to make. Disqualify them from the way they're commercial. I never looked for work. He's a very honest guy. And he goes away and his dad's a pretty good player. I never looked for work, and I didn't follow up on the opportunities for the interview. At the end of the day, what does that do? It does what the commission did. It approved his AP2 entitlement. He didn't approve the AP1, which takes me to the maintenance part, sir. We know what ADA says. ADA says that we, the employer, I am paid for the rehabilitation of the employer, or the employee, excuse me, including vocational services. It's defined in Section 8A. Before we get there, perhaps, we know that there wasn't any medical rehabilitation going on. The case becomes static in roughly April of 2012. Restrictions don't change after that. There is one additional medical visit in 2014, but it doesn't change the course of things. So, we don't have medical rehabilitation going on. Questions? Right back to what we were talking about, which is vocational rehabilitation. We know what WB Olson says. Promiscuous payment of maintenance during that prescribed vocational program. We understand that. We didn't have a vocational program. Why didn't we have it? A couple of things. Number 191, 10.11, the vocational rehabilitation goal, talks about the provision of services, if appropriate. Okay? SCUN in other cases talk about vocational services being communicated when there's no intent to return to work. I don't think we have that here. If you sit there, you really think this guy was coming back to work? I don't think he was. What else? It's difficult for us to make a determination about entitlement to vocational services when, A, there's no intent to return to work, and unless he shows up for the job interview, we might not even be here if he comes in for the job interview. So, the entitlement to the maintenance benefit, much like the PPE entitlement, is fact-based. So, you're saying it wasn't triggered? It wasn't triggered. It wasn't triggered at all. Never showed up for the job interview. We might not be here. No intention to ever return to work. The employee can engage his own job search effort. Now, we know that didn't happen in 2012. It didn't happen in 2013. It didn't happen in 2014. It happened in April of 2015. Section 8A says that the Commission is to resolve issues with vocational services. That's what it says in 8A. You get a remedy for that. It's called the Commission. You come in, you get out of here, and then you do the interview. Didn't get done. Didn't get done until April of 2015, when, as the Commission points out, in preparation for litigation. So, in closing, partially incapacitated from his usual and customer-minded employment. Yes. Improved impairment and incapacity. No. Commission Frank, Circuit Court, pointed out how the Commission's decision on maintenance was against the manifest way of evidence. So, that's our position. For the person, denial of maintenance. Very good. Thank you, Counsel. Counsel, you may reply. Thank you. Thank you. Appellant will first like to point out that in June, the employer did provide vocational assistance to the injured worker. Then, they claimed it was uncooperative with the vocational rehabilitation, and then it was appropriate to deny these benefits. In the present case, there was never any vocational assistance provided to the injured worker, even after he requested it. And so, arguing that he showed no intention to return to work is disingenuous because he did request these benefits. That, in itself, can show an intention to return to work and provide this trigger that Euclid is looking for to spur the payment of maintenance benefits. And so, there's no valid reason that his benefits were not triggered and that he showed no intention to return to work. And that's one of the main reasons that the Commission upheld the arbitrator's award of maintenance benefits. Very good. Thank you, Counsel. Thank you, Counsel, both, for your arguments in this matter. We'll be taking our advisement and written disposition with you.